UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TEODORO J. ORENGO ACEVEDO,    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 3:19-cv-30083-KAR
    )
ANDREW SAUL,    )
Commissioner of Social    )
Security Administration,    )
    )
    Defendant.    )

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER
(Docket Nos. 14, 16)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION AND PROCEDURAL HISTORY

Teodoro J. Orengo Acevedo ("Plaintiff") brings this action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for Social Security Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB and SSI on or

around January 8, 2015, alleging an onset date of December 20, 2013 (Administrative Record

("A.R.") 305).  Plaintiff claimed disability due to a fractured pelvis, a fractured left

radius/shoulder, pain in his gluteus maximus/tail bone, left knee pain, a cranial fracture, cervical

damage and pain, jaw pain, depression, anxiety, bad nerves, memory lapses and loss, and

arthritis in his joints (A.R. 71-72, 90-91).  His applications were denied initially (A.R. 54-87)

and on reconsideration (A.R. 90-119).  He requested a hearing before an Administrative Law

Judge ("ALJ") (A.R. 188-89).  A hearing was convened and adjourned on July 20, 2017 so that

Plaintiff could obtain representation (A.R. 20-27).  The ALJ reconvened the hearing on October 23, 2017 (A.R. 28-53).  On February 23, 2018, the ALJ issued an unfavorable decision (A.R. 19-38).  Plaintiff sought review by the Appeals Council (A.R. 295-98), which granted the request (A.R. 128-51, 299-303).  The Appeals Council adopted the ALJ's statement regarding the applicable law, the issues in the case, and the evidentiary facts (A.R. 8).  While the Appeals Council disagreed with the ALJ's finding that Plaintiff did not have limitations in his ability to interact with others, it further found that the hypothetical question the ALJ posed to the vocational expert took this limitation into account and provided a basis for the ALJ's finding that there were jobs available in the national economy that Plaintiff could perform (A.R. 11).  Accordingly, the Appeals Council found no basis for changing the ALJ's unfavorable decision (A.R. 9).  The Appeals Council's decision became the final decision of the Commissioner and this suit followed.

Plaintiff appeals from the final decision on the grounds that the ALJ: (1) failed to explain what weight he was assigning to the August 25, 2015 physical residual functional capacity assessment conducted by Howard Horsley, M.D., in violation of the regulations of the Social Security Administration; and (2) "improperly diminish[ed]" Plaintiff's credibility by requiring objective evidence to support his claims of disabling pain (Dkt. No. 15 at 8, 12).  Pending before this court are Plaintiff's Motion for Judgment on the Pleadings ("Plaintiff's Motion") (Dkt. No. 14) and Defendant's Motion for an Order Affirming the Decision of the Commissioner ("Defendant's Motion") (Dkt. No. 16).  The parties have consented to this court's jurisdiction (Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court denies Plaintiff's Motion and grants Defendant's Motion.

II.     LEGAL STANDARDS

A.  <u>Entitlement to DIB and SSI</u>

In order to qualify for DIB and SSI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[1]  A claimant is disabled for purposes of DIB and SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when he is not only "unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v), 416.920(a)(4)(i-v).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See, e.g., Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the

---

[1] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to his financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

five-step process).  If the hearing officer determines at any step of the evaluation that the

claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of

the claimant's residual functional capacity ("RFC"), which the Commissioner uses at step four to

determine whether the claimant can do past relevant work and at step five to determine if the

claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an
> administrative assessment of the extent to which an individual's medically determinable
> impairment(s), including any related symptoms, such as pain, may cause physical or
> mental limitations or restrictions that may affect his or her capacity to do work-related
> physical and mental activities.

Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the

burden to demonstrate RFC.  *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL

4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in

the national economy that the claimant can perform notwithstanding his or her restrictions and

limitations.  *Goodermote*, 690 F.2d at 7.

B.      Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review "is limited to determining whether the ALJ used the proper legal standards and

found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652,

655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but "the ALJ's findings shall

be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)). *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (the threshold for evidentiary sufficiency in substantial evidence review of agency fact finding is not high; it means such evidence as a reasonable mind might accept as adequate to support a conclusion) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F. App'x. at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.   <u>RELEVANT FACTS</u>

A.   <u>Plaintiff's Background</u>

Plaintiff was close to forty-two years old at the time of the hearing. He stated that he was 5'4" tall and weighed about 235 pounds (A.R. 32). He had last worked in 2013 as a pizza delivery driver. Before that, he had worked as a paramedic (A.R. 33-34). He read some English but had difficulty speaking the language (A.R. 34).

B.     Relevant Medical Records

Because Plaintiff's claims of error only relate to limitations arising from physical

impairments, the court limits its review of medical records accordingly.

1.   Healthcare for the Homeless ("H.H.")

From March 2015 to May 2016, Plaintiff treated at H.H.  He was seen by Katharine

Ewall, M.D., and several nurse practitioners.  His primary complaints were knee pain,

arthropathy, gastritis or reflux without bleeding, and headache.  He was obese and had high

blood pressure (A.R. 484-88, 490).  He reported chronic low back and knee pain with numbness

and tingling in his legs and his right arm (A.R. 492).  On March 10, 2015, Plaintiff reported

chronic neck and back pain.  It was noted that he was able to dress without difficulty, carried a

backpack with no problem, had a steady gait, and was able to get on and off the examination

table without difficulty (A.R. 527).  In April 2015, a nurse practitioner gave Plaintiff a neoprene

knee brace to see if it would help with his knee pain (A.R. 512).  A different nurse practitioner

noted that his gait was normal but he used a cane.  He had a normal range of motion in his knees

with no pain on palpitation and no swelling.  The care provider re-taped Plaintiff's knees (A.R.

515).  At a physical on or around April 7, 2015, Plaintiff told Dr. Ewall that his pain was worse

with use and walking.  Naproxen only helped a little.  Dr. Ewall noted that Plaintiff's lab results

were reassuring and ordered diagnostic imaging of Plaintiff's knees, lumbar spine, and ankles

(A.R. 519).  Test results showed degenerative changes of the knee joints "with mild narrowing of

the medial tibiofemoral joint space and subchodral sclerotic changes of tibial plateau."  The

impression was mild bilateral degenerative joint disease of the knees (A.R. 696).  Plaintiff had

mild degenerative changes of his lower lumbar spine with mild facet arthropathy (A.R. 697).  His

ankles showed minimal degenerative changes with no apparent acute bony abnormality (A.R. 698).

In May 2015, Dr. Ewall noted that Plaintiff's back was normal with no evidence of scoliosis or tenderness.  His gait was normal but he used a cane.  He had a normal range of motion in his knees with no pain on palpitation and no swelling.  He identified knee pain as his primary concern and requested a referral to an orthopedist as his highest health priority.  He also complained of neck and back pain (A.R. 508-09).  A June 2015 examination showed a decreased range of motion in his arms, shoulders, neck, and back.  He flinched at a very light touch to multiple areas on his back (A.R. 506).  In November 2015, a nurse practitioner noted that Plaintiff appeared well (A.R. 494).  In January 2016, a nurse practitioner recommended that he continue with daily walking as his exercise (A.R. 490).  In March 2016, Dr. Ewall identified headaches as Plaintiff's primary problem and report that his headaches were improved by medication.  His back was not tender, he had a normal range of motion in his spine, some pain with bending at his waist, and a negative straight leg test (A.R. 488, 536, 539).  A March 2016 MRI of Plaintiff's brain in response to worsening left-sided headaches showed no intracranial abnormality to explain Plaintiff's headaches (A.R. 702).  An April 27, 2016 progress note reflected that Plaintiff reported that diclofenac was working well although he also complained about pain in his wrists and knees (A.R. 530).

2.  New England Orthopedic Surgeons, Inc.  ("NEOS")

Plaintiff was seen by a physician's assistant ("PA") at NEOS on May 26, 2015 for bilateral knee pain diagnosed as chronic bilateral chondromalacia of the patella (A.R. 475).  Plaintiff walked slowly with the aid of a cane.  Examination of his knees showed no effusion, erythema, warmth, or ligamentous instability.  The range of motion was from 0 to 95 with

discomfort in the end range of the motion.  After reviewing x-rays, the PA told Plaintiff that it appeared most of his discomfort was coming from the patellofemoral joint.  The treatment recommendations were anti-inflammatory medication and physical therapy (A.R. 475-76).  Plaintiff was given a prescription for diclofenac, a nonsteroidal anti-inflammatory drug (A.R. 476).

Plaintiff was seen at NEOS for a follow-up visit for bilateral knee pain on July 7, 2015 by the same PA, who noted that Plaintiff continued to ambulate with use of a cane.  On examination, Plaintiff's knees showed no effusion, erythema, or warmth and no ligamentous instability.  The range of motion for both knees was from 0 to 95 with some discomfort at the end range of flexion.  The strength in his knees was 5/5.  The diagnosis remained chondromalacia patella.  Plaintiff reported significant improvement and the PA also felt that Plaintiff had made significant improvement in regard to his knee pain.  The PA recommended a home exercise program and told Plaintiff that his knee condition would not improve immediately and could take a couple of months to get better (A.R. 473-74).

In a September 2015 NEOS visit, Plaintiff reported a new pain localized in his neck.  On examination, Plaintiff was in no apparent distress.  He was able to rise from a seated position and walk around the examination room.  His muscle strength for all extremities was 5/5.  He had a decreased cervical range of motion and tenderness to palpitation.  The treatment plan was physical therapy and Naprosyn (A.R. 617).  In November 2015, Plaintiff returned to NEOS, reporting very local neck pain.  The examination results were similar to those in September 2015.  Plaintiff reported little relief from physical therapy (A.R. 616).  During a February 2016 follow-up visit, Plaintiff reported that he had not gone to physical therapy.  He reported that his back and neck were still causing him problems.  Plaintiff asked to be referred for injections.  The

PA sent Plaintiff to physical therapy (A.R. 614).  In April 2016, Plaintiff reported that physical

therapy had helped a little bit, but he was still struggling with pain in his neck and upper back.

He had no gait abnormalities and was in no apparent distress.  He could rise from a seated

position, walk around the examination room, and walk heel to toe without difficulty.  The

impression was cervicalgia and the PA referred Plaintiff for injections (A.R. 613).

From June through August 2015, October through November 2015, March through April

2016, and July through August 2016, Plaintiff attended physical therapy through NEOS.  He was

discharged from the first session on August 19, 2015 having missed three appointments.  The

discharge summary noted mild improvement (A.R. 558).  He attended six appointments in

October through November 2016.  The discharge summary reports that his status improved (A.R.

598).  The discharge summary following Plaintiff's last visit after sessions in March through

April 1, 2016 states that Plaintiff had improved and would work independently by means of a

home exercise program (A.R. 605).  The discharge summary for the sequence of treatments in

July through August 2016 states that Plaintiff reported a reduction in the level of his pain from 9

to 4 and that he had less pain and improved function (A.R. 652).

3.   Baystate Pain Management Center ("BPMC")

Dr. Ewall referred Plaintiff to the BPMC in June 2016 for treatment of pain in his neck

and lower back (A.R. 558-59).  Plaintiff reported that the pain was worse when he looked down,

he had difficulty turning his head to the right, and the pain shot down to both hands.  His neck

flexion and extension were restricted.  A Spurling test and the Hoffman's sign were negative on

the left and right (A.R. 560).  His gait and strength were normal.  The assessment on intake was

that Plaintiff presented with neck pain consistent with myofascial regional pain syndrome in his

neck in the setting of an otherwise benign examination (A.R. 561).  In July 2016 and January

2017, Plaintiff had trigger point injections to address pain (A.R. 555-56).

    4.  Vijay Patel, M.D.

Plaintiff established a primary care relationship with the office of Dr. Patel in or around

October 2016.  The intake form recorded obesity, GERD, HTN, knee arthritis, fatty liver, and

allergic rhinitis as historical medical problems (A.R. 579).  Plaintiff's prescription for diclofenac

was renewed and ice, elevation, compression, walking, and stretching were recommended as

treatment for his knee pain (A.R. 581).  On August 18, 2017, Plaintiff saw Dr. Patel for back

pain that had lasted for several days (A.R. 565).  Plaintiff had a full range of motion with pain.

A straight leg lift was negative.  The assessment was a back-muscle spasm (A.R. 566).  Dr. Patel

prescribed local heat, Ibuprofen, and a muscle relaxant, no bending, pushing, or pulling, and a

return to the office if Plaintiff's condition did not approve (A.R. 566).

    C.     Opinion Evidence – State Agency Assessments

Howard Horsley, M.D., conducted a record review on or around August 25, 2015 and

prepared a physical RFC assessment.  Dr. Horsley identified osteoarthritis and allied disorders as

a medically determinable severe impairment in Plaintiff's case (A.R. 62, 79).  He found that

Plaintiff had exertional limitations, as follows.  He could occasionally lift and carry 25 pounds

and could frequently lift and carry 20 pounds.  He could stand and/or walk for 4 hours out of an

8-hour workday.  He could sit on a sustained basis for more than 6 hours in an 8-hour workday.

His ability to push or pull was unlimited except for the assessed weight restrictions (A.R. 64-65,

81-83).  Dr. Horsley also found that the records supported postural limitations.  Plaintiff could

only occasionally climb ramps, stairs, ladders, ropes, or scaffolding.  He could occasionally

stoop, kneel, crouch, or crawl.  Dr. Horsley found that Plaintiff had no manipulative, visual or

communicative limitations.  According to Dr. Horsley, Plaintiff also had some environmental limitations, including that he should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery or heights, and avoid uneven surfaces (A.R. 65-66, 69, 82-83, 86).

On reconsideration, Walter Y.K. Goo, M.D., found that Plaintiff suffered from the medically determinable impairments of osteoarthritis and allied disorders and obesity (A.R. 96, 104, 111, 115).  Dr. Goo assessed Plaintiff with limitations beyond those assessed by Dr. Horsley as to Plaintiff's ability to lift.  In Dr. Goo's opinion, Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  Dr. Goo agreed with Dr. Horsley that Plaintiff could stand or walk for 4 hours and sit for about six hours in an 8-hour workday.  Beyond his lifting and carrying restrictions, he was not limited in his ability to push or pull (A.R. 98-99, 114).  Dr. Goo also agreed with Dr. Horsley that Plaintiff had postural limitations and could only occasionally climb ramps, stairs, ropes, and scaffolds and could occasionally stoop, kneel, crouch, or crawl (A.R. 99, 114).  Like Dr. Horsley, Dr. Goo found that Plaintiff had no manipulative, visual or communicative limitations.  In contrast to Dr. Horsley, Dr. Goo found that Plaintiff had no environmental limitations (A.R. 99, 114).  Dr. Goo explained his findings by noting that Plaintiff complained about multiple impairments, but examinations had shown a normal range of motion, normal neurological findings, and minimal degenerative changes in his knees, ankles, and back (A.R. 99-100, 114-15).

There is no other opinion evidence in the record addressing Plaintiff's physical impairments, resulting limitations, and RFC.

D.    Hearing Testimony

At the hearing, Plaintiff testified that he could read English, but was very limited in his ability to speak or write the language (A.R. 34-35).  He could read and write in Spanish.  He had

a driver's license and drove every now and then to go to church and the supermarket (A.R. 35). The most significant problems that prevented him from working were depression and anxiety. He also had recently begun to suffer from carpal tunnel syndrome and both knees bothered him, with the left knee being more painful. He had stopped taking pain medication on his doctor's advice because of an otherwise unidentified kidney problem. (A.R. 35-36). Plaintiff told the judge that he could not lift heavy things. The most he could lift was about five or ten pounds. (A.R. 37). His lower back was painful. He had headaches for which he took over the counter medications. Plaintiff told the ALJ that, without medication, his pain level on a typical day was nine on a scale of one to ten. He was in pain all the time. If he took Tylenol, his pain level decreased to maybe five. He was not a candidate for any surgery (A.R. 41). He believed he could not work because he could not stand for too long, he could not sit for too long, he slept for thirteen to fourteen hours at a stretch because of medication, he dropped things, and he did not know in advance what kind of day he would have (A.R. 42-43).

In terms of his daily activities, Plaintiff reported that he fixed his own food. He had a friend who helped him with laundry. He dressed himself with difficulty. He watched television, listened to music, and used the Internet. He had not traveled recently and did not have an exercise program (A.R. 41-42). He received injections for the pain in his back and neck that helped with the pain for about a month. He used to use a knee brace but the brace did not help anymore. His fingers were numb and it was hard for him to open bottles (A.R. 44-45). He could sit for 45 minutes at the most and stand for 20 to 30 minutes (A.R. 46).

The ALJ asked the vocational expert ("V.E.") to assume a hypothetical individual:

of [Plaintiff's] age, education, work experience, limited as follows, light exertion [as] defined under Social Security rules and regulations. … no more than frequent, frequent being defined as up to 2/3 of the workday, grasping, pinching, and twisting with the hands, work should not entail more – the performance of

> more than simple, routine tasks, work should not … involve direct overhead lifting or reaching, work should not require the operation of foot or leg controls, work should not be performed at heights using ladders, ropes or scaffolding, work should entail no more than occasionally, occasionally being defined as up to 1/3 of the workday, coworkers and public contact, work should not entail more than occasionally – again, occasionally being defined as up to 1/3 of the workday, use of ramps, stairs, stooping, crouching, crawling and kneeling

(A.R. 49-50). The ALJ asked whether there would be work in the national economy for such an individual (A.R. 50).

The V.E. testified that such an individual would be able to perform in the position of an assembler, DOT code 729.687-010, of which there were 50,000 positions nationally and 14,000 in Massachusetts; an inspector, DOT code 559.687-074, of which there were 40,000 positions nationally and 800 in Massachusetts; and a sorter, DOT code 922.687-086, of which there were 40,000 positions nationally and 750 in Massachusetts. Asked whether, if all of the limitations remained the same, but the work had to be performed at the sedentary level, there would still be work in the national economy for such an individual, the V.E. answered affirmatively, identifying the position of polisher, DOT code 713.684-038, of which there were 15,000 positions nationally and 400 in Massachusetts; inspector, DOT code 669.687-014, of which there were 20,000 positions nationally and 350 in Massachusetts; and assembler, DOT code 713.687-018, of which there were 15,000 positions nationally and 300 in Massachusetts (A.R. 50). The V.E. further testified that a hypothetical individual who was off-task because of chronic pain or psychiatric symptoms for twenty-five percent of the workday, or who would miss three or more days of work each month, would be unable to engage in full-time sustained work (A.R. 51).

    E.    <u>Appeals Council and ALJ Decisions</u>

Plaintiff's appeal is from the Appeals Council's April 24, 2019 decision (A.R. 7-11).

That decision, however, adopted substantial portions of the ALJ's February 23, 2018 decision.

Accordingly, the court summarizes the relevant portions of these decisions in tandem.

The ALJ conducted the requisite five-step sequential analysis and the Appeals Council:

agree[d] with the [ALJ's] findings under steps 1, 2, 3, 4 and 5 of the sequential evaluation; namely, that the [Plaintiff] has not engaged in substantial gainful activity since December 20, 2013; that the [Plaintiff] has severe impairments which do not meet or equal in severity an impairment in the Listing of Impairments; that the [Plaintiff] has no past relevant work; and that the [Plaintiff] is not disabled.

(A.R. 8). The ALJ found that Plaintiff had the following severe impairments: "obesity, depression, anxiety, antisocial personality disorder, mild degenerative changes of bilateral ankles, mild degenerative changes to the lumbar spine, cervical degenerative disc disease, chondromalacia of the patella, headache, hypertension, gastro esophageal reflux disease (GERD), arthropathy, myofascial pain syndrome, obstructive sleep apnea, and a history of a fractured pelvis and sacrum" (A.R. 131). The ALJ noted that Plaintiff had also claimed a traumatic brain injury, bilateral carpal tunnel syndrome, and kidney issues. Because the submissions to the Social Security Administration did not include records showing that Plaintiff had been diagnosed with any of these medical conditions, the ALJ concluded that they were not medically determinable impairments (A.R. 131).

In finding that Plaintiff did not have a severe impairment that met or equaled an impairment in the Listing of Impairments, the ALJ paid particular attention to Listings 1.02 and 1.04, which set out the criteria for, respectively, major dysfunction of a joint and disorder of the spine. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.02, 1.04. As to the former, the ALJ found, in summary, that the record did not include evidence of a major dysfunction of a joint characterized by anatomical deformity and chronic joint pain or stiffness with medically

14

accepted imaging of a damaged joint resulting in an inability to ambulate effectively or to perform fine and gross movements effectively.  As to the latter, the ALJ pointed to an absence of evidence of nerve root compression resulting in inability to ambulate effectively (A.R. 132).  The ALJ also considered Listing 3.02, respiratory disorders, and found that Plaintiff did not meet the requirements of pulmonary testing nor did he have the requisite three hospitalizations caused by a respiratory disorder (A.R. 132).

After consideration of the entire record, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined by the relevant regulations,[2] except that Plaintiff was not literate in English, would be limited to no more than frequent grasping, pinching, and twisting with his hands, would need to avoid direct overhead reaching and lifting, and could not operate foot or leg controls.  He would need to avoid heights and using ladders, ropes, or scaffolds and would be limited to no more than occasional climbing ramps or stairs, stooping, crouching, crawling, or kneeling.  He would be limited to no more than occasional coworker and public contact and to simple and routine tasks (A.R. 133).  Relying on the V.E.'s testimony, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff remained capable of performing notwithstanding his limitations.  Explaining his reasons for not fully accepting Plaintiff's statements about his pain, the ALJ noted that the medical

---

[2] Sedentary work is defined as:

> work [that] involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

evidence confirmed a history of obesity, mild degenerative changes in Plaintiff's ankles and lumbar spine, cervical disk disease, chondromalacia of the patella, headaches, arthropathy, myofascial pain syndrome, and a history of a fractured pelvis and sacrum. The ALJ noted that Plaintiff treated his physical impairments fairly conservatively, mainly with therapy, medications, and injections. At the hearing, Plaintiff told the ALJ he was not currently treating his knee pain. Radiological images of his knees, lumbar spine, and ankles showed mild degenerative changes. With the use of a cane, his gait was normal. He had reported improvement following physical therapy. Medical records frequently described him as being able to rise from a seated position without difficulty, ambulate around the room, and walk heel to toe. He generally did not report numbness, weakness, or tingling in his extremities to treating care providers. For these reasons, the ALJ concluded that Plaintiff's physical impairments were not so severe as to disable him from performing all work on a regular and continuing basis (A.R. 142-43). Accordingly, the ALJ found that Plaintiff had not been under a disability as defined in the Social Security Act from December 20, 2013, the date of the applications, to the date of his decision (A.R. 144).[3]

IV.   ANALYSIS

---

[3] The error in the ALJ's decision identified by the Appeals Council is not implicated in the issues raised by Plaintiff before this court. The Appeals Council found that, while the ALJ correctly concluded that Plaintiff had moderate limitations in his ability to interact with others, the RFC in the hearing decision did not reflect any limitation on Plaintiff's ability to interact with others (A.R. 8). In finding the error harmless, the Appeals Council noted that, in the hypothetical question the ALJ had posed to the V.E., the ALJ had asked the V.E. to identify positions that would entail no more than occasional contact with coworkers and the general public, thereby taking into account a limitation on Plaintiff's ability to interact with others. Because the ALJ asked the V.E. to identify positions for a hypothetical individual with an RFC that included this limitation, the Appeals Council accepted the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act (A.R. 8). In all other respects, the Appeals Council agreed with and adopted the ALJ's decision (A.R. 10-11).

A.    To the Extent the ALJ Erred in his Treatment of Dr. Horsley's Opinion Evidence,
      Any Such Error was Harmless.

The opinions of Drs. Horsley and Goo are the only record medical opinions addressing

Plaintiff's RFC.  Plaintiff's first claim of error is that the ALJ erred by failing to explain what

weight he assigned to Dr. Horsley's opinions.  The ALJ accorded significant weight to Dr. Goo's

reconsideration opinion, finding that the limit to sedentary work and the postural limitations were

consistent with the record as a whole (A.R. 141).  As Plaintiff acknowledges, the ALJ accurately

summarized Dr. Horsley's opinions about Plaintiff's limitations (A.R. 141; Dkt. No. 15 at 10).

Plaintiff is correct, however, that the ALJ did not explain what weight, if any, he assigned to Dr.

Horsley's opinions and that the Social Security Administration's pertinent regulation provides

that "[ALJs] and the Appeals Council may not ignore [opinions from State agency medical and

psychological consultants] and must explain the weight given to these opinions in their

decisions."  SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996); *see also* 20 C.F.R. §§

404.1527(e), 416.927(e).  Plaintiff contends that the ALJ's failure to explain the weight he

assigned to Dr. Horsley's opinions requires remand.  The Commissioner contends that, in the

context of this case, the ALJ's failure to explain the weight he gave to Dr. Horsley's opinions is

harmless because the RFC assessed by the ALJ was more favorable to Plaintiff than was the RFC

assessed by Dr. Horsley (Dkt. No. 17 at 10).  The court agrees that, in this case, error, if any, by

the ALJ in his treatment of Dr. Horsley's opinion was harmless.  Indeed, while pointing to the

ALJ's failure to explain what weight he assigned to Dr. Horsley's opinions, Plaintiff has made

no attempt to explain how he was harmed by the ALJ's claimed error or why there might be a

different result if the case was remanded for further evaluation of Dr. Horsley's opinion

evidence.

It is well-settled that an ALJ must consider the medical opinion evidence in the record. *See, e.g., Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015). There is, however, no basis here for a contention that the ALJ failed to consider Dr. Horsley's opinions concerning Plaintiff's limitations because the ALJ accurately summarized those opinions (A.R. 141). Any error by the ALJ in failing to explain the weight he assigned to Dr. Horsley's opinion is harmless "because Dr. [Horsley's] opinion did not support a finding of disability and the ALJ's RFC was more favorable to Plaintiff than Dr. [Horsley's] RFC analysis." *Lopardo v. Berryhill*, Case No. 3:17-cv-30185-KAR, 2019 WL 1284820, at *11 (D. Mass. Mar. 20, 2019) (the ALJ's failure to explain the weight assigned to a state agency physician's opinion evidence was harmless in the context of the case). "If the ALJ's RFC is 'generally consistent' with the findings in a medical opinion, or if the RFC is 'more favorable' to the claimant than the opinion's findings, then '[t]here is no reason to believe that a further analysis or weighing of [the] opinion could advance [the claimant's] claim of disability." *Perez Guerrero v. Colvin*, CASE NO. 14-23841-CIV-LENARD/GOODMAN, 2016 WL 4807953, at *5 (S.D. Fla. Mar. 23, 2016) (alterations in original) (quoting *Thompson v. Colvin*, 551 F. App'x 944, 947-48 (10th Cir. 2014)): *see also Ortiz v. Colvin*, CIVIL ACTION NO. 13-12793-DPW, 2015 WL 4577106, at *8 (D. Mass. July 30, 2015) (The claimant's argument was unconvincing when she was "essentially arguing that the ALJ's mistake was that he decided more favorably to her than the state agency opinions. There is no reversible error when an ALJ gives a claimant the benefit of the doubt.")

The ALJ found that Plaintiff could perform sedentary work with additional restrictions, meaning that Plaintiff could only perform work that would not require him to lift more than 10 pounds at a time and that generally would be performed in a seated position. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). This assessment was more favorable to Plaintiff than the assessment

by Dr. Horsley that Plaintiff could occasionally lift or carry up to twenty-five pounds, could frequently lift up to twenty pounds, and could stand or walk for four out of the eight hours in a workday (A.R. 64-65, 81-83). Dr. Horsley found that Plaintiff had no manipulative limitations (A.R. 65, 82). The ALJ, in contrast, found that Plaintiff was limited in his ability to grasp, pinch, and twist and could not operate foot or leg controls (A.R. 133).

The only limitations assessed by Dr. Horsley that did not appear in the ALJ's assessment of Plaintiff's functional limitations were environmental. Dr. Horsley opined that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights (A.R. 65-66, 82-83). While the ALJ agreed that Plaintiff should avoid heights (A.R. 133), the ALJ's assessment of Plaintiff's RFC did not limit Plaintiff's exposure to extreme cold or vibration. Nonetheless, in this case, as in the case of *Kolek v. Colvin*, C.A. No. 13-cv-30156-MAP, 2014 WL 6893554, at *2 (D. Mass. Dec. 5, 2014), "remand would be futile because the positions the vocational expert testified the Plaintiff was capable of performing – [polisher, eyeglasses frames, dowel inspector, and final assembler] – do not require exposure to extreme cold or vibrations." Even if this court were to remand the case to the Social Security Administration to address the ALJ's omission, the addition of these limitations to the hypothetical question would still result in a supportable finding that Plaintiff was capable of performing the same positions because those positions did not require concentrated exposure to extreme cold or vibration. *See* Dictionary of Occupational Titles ("DICOT") 713.684-038, polisher, eyeglasses frames, 1991 WL 679267 (stating that the position does not include exposure to extreme cold or vibration); DICOT 669.687-014, dowel inspector, 1991 WL 686074 (same); DICOT 713.687-018, final assembler, optical goods industry, 1991 WL 679271 (same). "Accordingly, the ALJ's error, assuming one occurred, did not prejudice Plaintiff because the

expert's testimony would not have changed."  *Kolek*, 2014 WL 6893554, at \*2.  "[A] remand in

not essential if it will amount to no more than an empty exercise."  *Ward*, 211 F.3d at 656; *see*

*also Lopardo*, 2019 WL 1284820, at \*10-11.

      B.      The ALJ Properly Assessed Plaintiff's Subjective Complaints of Pain

      Relying on *Johnson v. Astrue*, 597 F.3d 409 (1st Cir. 2010) (per curiam), Plaintiff argues

that because myofascial pain syndrome, a chronic pain disorder, is diagnosed based primarily on

a patient's subjective complaints of pain, the ALJ erred in relying on objective evidence from

Plaintiff's medical records in concluding that Plaintiff was not disabled (Dkt. No. 14 at 12-15).

Plaintiff is wrong.

      In *Johnson*, the plaintiff "alleged disability based primarily on fibromyalgia and a mental

condition (depression and anxiety)."  *Id.* at 410.  In support of the plaintiff's benefits application,

she submitted an RFC assessment from her treating care provider, an expert on fibromyalgia,

who opined that the plaintiff's medical condition precluded her from performing sedentary work.

*Id.* at 411.  The ALJ accorded little weight to this opinion evidence primarily because the

limitations identified by the treating care provider were based on the plaintiff's subjective reports

of disabling pain.  *Id.* at 412.  The First Circuit examined and rejected the ALJ's reasons for

discrediting the plaintiff's claims of disabling pain, reasoning that, having accepted the diagnosis

of fibromyalgia, the ALJ had to accept that the plaintiff suffered from the symptoms attributable

to that condition unless there was substantial evidence that the plaintiff did not suffer from those

symptoms, which include chronic widespread pain.  *Id.* at 411-14.

      Myofascial pain syndrome is a medical condition distinct from fibromyalgia, *see*

*Michelle F. v. Saul*, Docket No. 2:19-cv-00344-NT, 2020 WL 1922589, at \*2 (D. Me. Apr. 21,

2020), although there are similarities.  *See id.* ("The ALJ grouped together fibromyalgia and

myofascial pain syndrome, even though they are distinct medical conditions.") (citing *Zendejas v. Astrue*, Civil Action No. SA-08-CV-0633 XR(NN), 2009 WL 1883905, at \*6 (W.D. Tex. June 29, 2009) (report and recommendation).  "Myofascial pain syndrome is the '[i]rritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease).'"  *Zendejas*, 2009 WL 1883905, at \*6 (alteration in original) (quoting J.E. Schmidt, M.D., <u>Attorney Dictionary of Med.</u> 4-M 7180 (2005)).  This condition produces a more localized pain than fibromyalgia and often has objective physical findings.  *Id.* (quoting D.J. Tennenhouse, <u>Attorneys' Med. Deskbook</u> § 24:16 (4th ed.)); *see also Michelle F.*, 2020 WL 1922589, at \*2.

    *Johnson* does not dictate a different result in this case.  The ALJ accepted the diagnosis of myofascial pain syndrome and concluded that it was a severe impairment (A.R. 131).  When a claimant's impairment meets or equals the criteria for a listed impairment, the claimant is automatically deemed disabled.  *See, e.g., Michelle F.*, 2020 WL 1922589, at \*1 n.2.  In the instant case, Plaintiff has not disputed the ALJ's finding that his diagnosis of myofascial pain syndrome did not meet or equal the criteria for a listed impairment (A.R. 132).  Like a diagnosis of fibromyalgia, a diagnosis of myofascial pain syndrome is not *per se* disabling.  *See Wilson v. Astrue*, 602 F.3d 1136, 1142-44 (10th Cir. 2010) (affirming the ALJ's finding that the claimant was not disabled in a case in which the claimant was variously diagnosed with myofascial pain syndrome and fibromyalgia; the ALJ was aware that a claimant's pain may be disabling in the absence of neurological findings); *Zendejas*, 2009 WL 1883905, at \*4-6; *cf. Downs v. Comm'r, Soc. Sec. Admin.*, No. 2:13-CV-02-DBH, 2014 WL 220697, at \*4 (D. Me. Jan. 21, 2014) (*Johnson* does not stand for the proposition that an ALJ who finds that a claimant has fibromyalgia must accept a claimant's allegations of disabling pain at face value).

"What is missing from the administrative record in this case is any assessment by a treating care provider that supports Plaintiff's claims of disabling functional limitations attributable to [myofascial pain syndrome]." *Barowsky v. Colvin*, Case No. 15-cv-30019-KAR, 2016 WL 634067, at *4 (D. Mass. Feb. 17, 2016) (fibromyalgia case).  In the absence of an assessment from any of Plaintiff's medical treating care providers concerning his functional limitations and his ability to work, the ALJ was left with the state agency physicians' assessments of Plaintiff's RFC and Plaintiff's subjective complaints of pain and functional limitations.  "State agency medical … consultants are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1).  Where none of Plaintiff's treating health care providers described functional limitations attributable to Plaintiff's medical impairment of myofascial pain syndrome (or any other medical impairment), the ALJ properly afforded "significant weight" to Dr. Goo's opinions about the extent of Plaintiff's functional limitations.  *See, e.g., Mariano v. Colvin*, C.A. No. 15-018ML, 2015 WL 9699657, at *9 (D.R.I. Dec. 9, 2015), *rec. adopted*, 2016 WL 126744 (D.R.I. Jan. 11, 2016); *see also Andrade-Hermort v. Berryhill*, 292 F. Supp. 3d 530, 533-34 (D. Mass. 2018).  Dr. Goo found that, while Plaintiff had functional limitations, those limitations did not preclude him from engaging in any and all forms of gainful employment.

Plaintiff's contention that the ALJ erred by requiring objective evidence substantiating Plaintiff's claim of disabling pain misses the mark.  This is not, as Plaintiff appears to argue, a case in which the ALJ required objective evidence to substantiate a diagnosis that depends to a large extent on a claimant's subjective reports of disabling pain.  The ALJ accepted the diagnosis of myofascial pain syndrome (A.R. 131).  While it may be error to require objective evidence of a medical impairment such as myofascial pain syndrome or fibromyalgia, diagnosis of which

depends to a significant extent on a patient's description of symptoms of pain, the physical

limitations caused by symptoms of conditions such as fibromyalgia "'do lend themselves to

objective analysis.'"  *Andrade-Hermort*, 292 F. Supp. 3d at 533 (quoting *Boardman v.*

*Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003)).  To that point, the governing

Social Security Ruling, SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017), provides, as to

consideration of objective medical evidence concerning a claimant's subjective claims of

disabling pain, that

> [s]ymptoms cannot always be measured objectively through clinical or laboratory
> diagnostic techniques.  However, objective medical evidence is a useful indicator
> to help make reasonable conclusions about the intensity and persistence of
> symptoms, including the effects those symptoms may have on the ability to
> perform work-related activities for an adult … [The ALJ] must consider whether
> an individual's statements about the intensity, persistence, and limiting effects of
> his or her symptoms are consistent with the medical signs and laboratory findings
> of record.
>
> The intensity, persistence, and limiting effects of many symptoms can be
> clinically observed and recorded in the medical evidence.  Examples such as
> reduced joint motion, muscle spasm, sensory deficit, and motor disruption
> illustrate findings that may result from, or be associated with, the symptom of
> pain.

"[T]he ALJ [also] reviewed [Plaintiff's] medical records in detail and considered the

statements that the plaintiff had made to his treating physicians and other medical professionals."

*Arrington v. Colvin*, 216 F. Supp. 3d 217, 237-38 (D. Mass. 2016); *see also Bourinot*, 95 F.

Supp. 3d at 180.  Plaintiff has not pointed to any entry in his treatment records in which a health

care provider suggested that Plaintiff had functional limitations that would preclude sedentary

work or that he was disabled from working, and the court is not aware of any such entry.  The

reasons the ALJ gave for finding that Plaintiff's statements about the intensity, persistence, and

limiting effects of his pain were not wholly supported by the evidence were consistent with the

guidance in SSR 16-3p, which provides for the consideration of laboratory findings of record in

evaluating the intensity and persistence of symptoms.  SSR 16-3p, 2017 WL 5180304, at *5.

The ALJ permissibly relied on the radiological studies of Plaintiff's joints, which showed mild

degenerative changes, along with repeated entries in medical records indicating that, while

Plaintiff sometimes used a cane, his gait was normal and he was able to rise from a seated

position, ambulate around the room, and perform a heel to toe walk without difficulty.  In

compliance with the governing regulation, the ALJ did not rely exclusively on the objective

medical findings in the record in concluding that the record did not wholly support Plaintiff's

claims about the intensity, persistence, and limiting effects of pain.  The ALJ considered

Plaintiff's statements about his physical condition, that the medical records showed that

treatment of his medical impairments was relatively conservative, and Plaintiff's reports that

treatments for pain, including physical therapy and trigger point injections, had been helpful

(A.R. 142).  The ALJ further relied on information showing that Plaintiff was independent in his

daily living activities.  By the time of the hearing, he had lived alone for some two years, was

able to dress and groom himself, do light cleaning, and laundry, and shop and cook for himself.

He drove and took public transportation without assistance (A.R. 33, 35, 41-42, 350-51).  *See*

*Coskery v. Berryhill*, 892 F.3d 1, 7-8 (1st Cir. 2018) (the ALJ permissibly relied on evidence of

the claimant's ability to carry out certain daily activities as some support for the ultimate finding

that the claimant was not disabled).

There was evidence in the record to support Plaintiff's claims of severe pain.  Beginning

in 2015, he was persistent in seeking treatment for his impairments and, with some exceptions, in

complying with the treatment recommendations of his care providers.  It is, however, the ALJ's

responsibility to resolve the conflicts in the evidence such as these and to draw reasonable

inferences from the record.  *Bourinot*, 95 F. Supp. 3d at 182.  When, as in this case, the ALJ has

not committed a legal error and his findings are supported by substantial record evidence, there is

no basis for reversal and remand.  *See, e.g., id.*

     V.      C<small>ONCLUSION</small>

For the foregoing reasons, the Plaintiff's Motion for Judgment on the Pleadings (Dkt. No.

14) is DENIED, and the Defendant's Motion for an Order Affirming the Decision of the

Commissioner (Dkt. No. 16) is GRANTED.  The Clerk's Office is directed to enter judgment

accordingly and close the case on the court's docket.

It is so ordered.

Dated:  September 3, 2020                           Katherine A. Robertson
                                           KATHERINE A. ROBERTSON
                                           U. S. MAGISTRATE JUDGE